We'll hear argument now in Wade v. Ramos. Ms. Dimkar. Yes, Your Honor. I'm Irene Dimkar. I represent Wilhelm Wade and Simone Wade, and it's very good to be here. There's a dispute of material fact that precludes the possibility of summary judgment here, and that dispute of fact affects the validity of the warrant. That makes the validity of the warrant a jury question. The court acknowledged— How could the validity of a warrant ever be a jury question? Well, there's a dispute here as to what happened when the police arrived. No, when the police arrived, we're not dealing with a dispute about the validity of the warrant. There may be a dispute about the execution of the warrant. A dispute about the validity of the warrant is a dispute about the affidavit and potentially about what was said before the state judge when Doe appeared before the state judge. Did you ask for a hearing at which the proceedings before the state judge would be put in the federal record? No, not what happened before the state judge. All right. Well, then we've got the affidavit and not even a request for a hearing on the proceedings before the state judge. So I don't see how there could be any remaining dispute about the validity of the warrant, certainly not a jury dispute. The execution of the warrant, that's a different matter. Your Honor, I think that these are not separate issues. Sometimes they are, validity of the warrant and the execution. But why did the defendant officers enter the Johnson apartment, the White apartment, through the front doors at the same time if the warrant was only for the second floor? And we've given... Warrant counsel, the warrant is what it is. It's a paper document. What it is, is not disputed. How it was executed, I understand that can be disputed. Are you contesting the truth of the asserted fact that Judge Walowski stated that she had a printout of Doe's criminal history when she reviewed the warrant application? We did not receive a copy of the criminal history. We had to ask the defendants to produce one, and they produced one that was after the fact, that was not correct, and it was redacted. Part of our problem here is the redactions did not include, they did not include the IR number. I want to get back to Judge Easterbrook if I could, but what Johnson observed only makes sense as if there's something wrong with the warrant. I want to maybe try this from a different angle. The warrant describes this as being on the second floor, because I gather there are a few steps that go up, and then there's the Johnson unit, and then there are more steps that go up, and there is the Wade's unit. And whether you conceptualize Johnson is on two and Wade's is on three, or whether Johnson is one and Wade is on two, was confusing. So as the warrant is executed, I understood your complaint to be that the warrant doesn't say go to two apartments, and so they went to two apartments. And in that sense, I'm understanding your argument to say they went beyond the scope. They had to sit down and figure out which apartment. Here are two possible apartments that this warrant may be describing. Which one do we have the authority to search? And instead they went and searched both of them. Is that where we are? That's right. And the court below found that there was a dispute over whether John Doe actually told Ramos that Johnson's apartment was on the second floor. This is a typical setup. But the judge does have Doe in the back seat of the car, right? I mean, the judge puts Doe under oath, as I recall. That's correct, Your Honor, but we don't know what Doe said. We don't know what Doe said because you've just told us you never asked for a hearing to find out what was said before the state judge. Your Honor. Your whole approach is to assume that the only support for the warrant was the affidavit. That's not true. The support for the warrant was the affidavit plus whatever was said under oath before the state judge. But there's been no effort in this federal litigation to find out what that was. Your Honor, we have a judicial admission from the defendants that the only grounds for probable cause are in the affidavit. There was nothing outside the affidavit given to the judge. There was nothing that was said to the judge that is not in the affidavit. We relied on that judicial admission. It came from a request to admit from the parties. We offer two possibilities of what might be going on here. Let me get back to Judge Wood. This is a setup that occurs in a lot of apartments in Chicago. In fact, it's in the training materials. I have a copy of the training materials for the Chicago Police Department that it's unclear what's the first floor and what's the ground floor. Because you go up one flight to the first floor, go down one flight to the basement, go up two more flights to get to the second floor. So if the informant said, I went up a flight of stairs, and Ramos says, well, I'm going to put down the second floor, that's a problem. And that's a problem that has been identified by the Chicago Police Department that happens in these apartments. So we give two possibilities of what might happen here. Either Ramos was unsure from what the informant said. The informant might have said, I went up some stairs. He might have been unsure. He said, OK, we'll put down second floor, and then we'll deal with it when we get there. Or when they got there, they knew what apartment they wanted to search. They arrived, went up that first flight of stairs, saw that one on the door. And Ramos said, our warrant isn't for one. It's for two. Sends half the team upstairs, leaves half the team downstairs, and they go through both units at the same time. If we accept Dotson's testimony as true, and the court has to, there is something very fishy with the warrant if the police are going through both apartments at the same time. They're not clear which apartment they should be going to. And it's either something they knew about ahead of time and just said, oh, well. Or when they got there, they found that one and just said, we're not going back to the magistrate. We don't have time to do that. Let's do both. But, you know, how much of a record is there of all this? The district judge's opinion repeatedly says things like, you know, maybe there was a theory here, but the record just isn't developed. And, I mean, one of the things you could be arguing is that when they go in the Wade's apartment, they realize right away, you know, this isn't the one that we're supposed to go to, and that would be kind of a failure to abandon claim. But I don't see that one developed in this record. So, yeah, I wondered at what moment the police should have realized that they were in the wrong apartment and aborted the search, in your view. Immediately. Within seconds, they were in both apartments because they had run through the first-floor apartment, run through the second-floor apartment. All this boatload of drugs, heroin, cocaine, paraphernalia is all out there on the first floor. They talked to the girlfriend, and they said, who lives here? She says Terrell, Terrell Johnson. And so they knew right then, okay, our target lives on the first floor. Here's where the operation is. We have the wrong place. So we submitted that at that point they should have abandoned the search. But I wanted to point out something that I think is not fair to the plaintiff, and that is that we were not allowed access to this John Doe, this informant, to get information. We knew that he was not reliable. We knew his information was not reliable. But we couldn't act on it. We couldn't talk about it. We couldn't talk to our clients about it. We couldn't investigate it. We couldn't depose him. When we deposed the defendants, we couldn't ask the defendants anything about the specific informant that we knew about. So we had our hands tied. So when the trial court says, this is not in the record, it's a catch-22. You didn't allow us to depose John Doe. We could have deposed him without the plaintiff being there. That would have been a possibility. I've done that in other cases. We have deposed the John Doe informant. The plaintiff isn't there. And everything is kept quiet. But we weren't allowed to talk about it to our clients. We weren't allowed to depose the informant. We weren't allowed to find his RCI file. Well, because the district court decided that the informant's privilege applied. And that's a well-recognized privilege. And this informant seems to have been in the business of being an informant, as far as I can tell. But they conclude, even after the inadvertent disclosure of the IR number, the court concludes that the privilege does apply here. Why was that an abuse of discretion? Our argument is that it doesn't matter. It's irrelevant whether the privilege applies or not, whether there was inadvertence or not. We have contested those issues. But the judge resolved that against you. Right. And she never ruled on our argument that we have obtained this information from an independent source. And that goes to Rule 502, what the defendant could have done. They waited 14 days before they got an order from the court. And that just took it off of PACER. And we said to the judge, you can't put the genie back in the bottle. This is a World Wide Web. It's out there. So then we said, okay, we'll prove it to you. We found, we are not computer forensics people. We, on our own, found four websites. Two months later, it's still out there. We attached the exhibits to the court and said, look, it is still out there. Why can't we use it? So what the judge did then was she said to the defense attorney, go take care of that too. So each time it was, okay, we've taken care of it. Okay, we've taken care of it. And meanwhile, we believe it's still out there. This is the World Wide Web. We weren't allowed to hire an expert, a computer expert, to tell us, you know, where else it might be. We could only tell the judge where we found it. But it was, you know, the defendant's argument is when plaintiff told us about things, we took care of it. But that's not good enough. Their obligations, if this is truly confidential, first of all, the document should have been marked confidential. When we told them two days after we got it, you know, you may want to look at this again. I mean, did you, is this maybe, are you conceding this issue? Why, you know, why did you give us the IR number? Because everybody knows what the IR number is. It's not, you know. Forgive me. They gave you the IR number because lawyers are human and lawyers make mistakes. In this case, the defense lawyers made a mistake that could have put the life of the CI at risk. I mean, if the shoe were on the other foot and you made a similar mistake and someone's safety was at stake, I don't think you'd want opposing counsel to exploit that error. First, we don't believe that his life is at risk. In fact, at one point the judge said, I don't think that there's danger here to the informant. She made that finding. She said, I don't think that there's any danger to the informant here. But there was never a ruling on whether this information is in the public domain. There's never a ruling as to whether it was obtained through a source independent of the discovery. And the defense attorney, okay, if you're willing to say the defense attorney made a mistake, well, then they waited 14 days. And then they waited 72 days later before they started even looking at the aggregator websites. And that's only because we said, look, it's still out there. And we think it's probably still out there now because, as I said, this is not – it's going back in time and the legal profession has to get into the 21st century. It's not a situation where if something is disclosed and say it is inadvertent, you can't just give back the papers. That doesn't work anymore. It doesn't work especially when the person has filed the document. They filed the document and then it's just out there. So we never got a ruling as to our argument that it's obtained from a source independent of the lawsuit. There are protections for informants. We have deposed informants in other cases. The plaintiffs were not present. Everything was under wraps. And then we had to go back to the judge for permission to go further, take any steps. But we were prevented from having the information that we needed to have because we wanted to know, do you know Terrell Johnson? Were you actually in his place? We think that this informant was pressured to speak to the police. And it could be that he never even went there. It could be a friend of his said Terrell Johnson, he could have said I'm under pressure with the police. What do you know? And a friend could have said Terrell Johnson is doing drugs. He's got a whole big operation at 4131 West Crystal. And that's information that could have been given to the police. We don't know that. There's a lot we don't know. And so to say, well, we can't establish our case, well, that's what 56D is all about. The rule says that you can say that you are being prevented from, you don't have all the information that you need. And that's the situation we have here. Let us have access to the John Doe informant because we'll find out things that we need to know. Thank you, Your Honor. Your Honor, could I have any time for rebuttal? You've used your time. I'm sorry. Thank you. Ms. Hornstra. You're muted, Ms. Hornstra. You need to unmute. Thank you, Your Honor. I'm sorry. Thank you for letting me know. And may it please the court. The search at issue in this case was conducted based on a warrant issued by a judge who met in person with the informant who provided the tip. That gave the warrant judge an opportunity to evaluate the informant's knowledge, demeanor, and sincerity. That informant, Doe, told officer... Ms. Dimkar asserted during oral argument that you have agreed that absolutely nothing took place before the state judge in person. Is that accurate? No, that is not accurate. I don't know where that comes from. The search warrant complaint itself states that it's clear from the record that officer Ramos took the Doe informant to officer, the state court judge. She swore him in, had an opportunity to question him, and the warrant complaint... Could I interrupt, though? I understood Ms. Dimkar making a slightly different point, which was that whether Doe was there or not, fine, Doe was there, but that nothing was added to the record that wasn't already in the affidavit for the warrant and the warrant itself. So maybe, yes, I'm Doe was said, but nothing... I mean, we have no idea how lengthy a conversation she did or did not have with Doe. There's no dispute that Doe was presented to the warrant judge. She swore him in, that she asked him questions, he provided, he related the information that was in the warrant complaint. I think the issue that Ms. Dimkar is raising is that there was an admission that everything that provided probable cause, I think in terms of background, was in the warrant complaint. Right. So the question is, is that a, do you agree with that statement? It seems like it's open to interpretation. I mean, there wasn't additional information that Officer Ramos directly provided to the warrant judge beyond what was presented to her in the form of Doe presenting information to her and what was in the warrant complaint, which related what Doe had said. And the warrant complaint itself states that the judge, the warrant judge was provided with a copy of Doe's criminal history. So this idea... The three of them were in the car together, right? Correct. Okay. How come we know what was said in the car? So Officer Ramos was deposed and testified. There wasn't a whole lot of testimony about this. Part of these complaints about not being able to get information about what happened is really due to the way that Plaintiff's Counsel conducted these depositions. Officer Ramos was deposed for a full day, but Plaintiff's Counsel started the deposition at 11 and didn't get around to starting to ask these questions about how the warrant was obtained until in the last hour of the deposition and ran out of time on these things. And so Plaintiff's Counsel asked Ramos about the process of going to see the warrant judge. Ramos testified that he took Doe to see to the warrant judge, that the judge swore him in, that she questioned him, and that he relayed what he had told Ramos, which was that he went to go buy drugs from somebody he knew as Terrell Johnson the day before, that it was at the address of 4131 West Crystal that he had bought drugs from this Johnson a few times before. That was the substance of what was in the warrant complaint. Ramos clearly testified that the judge had a chance to ask all those questions, and there's been nothing to cast doubt on that. As Judge Easterbrook pointed out, there wasn't any effort made to further probe into what happened at that hearing. There's really just no dispute of fact that Doe was presented to the warrant judge and that he relayed what happened. And the warrant judge had the opportunity at that point, you know, if there were questions about Doe's motive or about his background, she had his criminal record. There wasn't anything that was kept from the warrant judge on this background. So this idea that this was a sketchy character, that, you know, there's something hidden about him just has no basis in the record. And with that information, the judge appropriately approved the warrant. This went to the state's attorneys before approved this. The judge concluded there was sufficient probable cause for the warrant. You know, and the warrant was valid on its face. It was a good warrant, and it was on that basis that the search was executed. But, you know, here let me interject here because that, of the many things that we discussed with Ms. Dimkar, this is something that bothers me. The warrant seems to have had a serious ambiguity in it. Like which floor does it pertain to? Because with the layout of these buildings that is, in fact, a pretty common layout, it's just ambiguous. And it should have been pretty clear quite soon that the Wades unit was not the one that the informant had been talking about. And yet the police don't behave. I mean, they behave as though the warrant said this is a warrant for units one and two, so to speak, first floor and second floor. And they don't stop. They rampage through the Wades place. Why isn't that a theory worth preserving? Well, Your Honor, I would disagree on two points that you made. First, that there was an ambiguity in the warrant. And second, that it should have been clear when they entered the Wades unit that they had the wrong unit. How do they go into two different units when it's a warrant? I mean, warrants are supposed to be specific as to the place. Particularly describing the place to be searched. That's what the Fourth Amendment says. Yes. So the warrant in this case was clear. It said second floor apartment. And Officer Ramos took the informant by the property, pointed it out. He actually showed him a picture. He pointed to the second floor. There was no ambiguity that Doe said that he purchased drugs from the second floor unit. But I'm not sure I agree with that. I mean, yes, they go by. But what floor? This is actually the curse of American English, I'm going to add. This would not have been a problem if we had been in France. Or ancient Rome. Right. Or ancient Rome. There would have been a ground floor and a first floor that you go up one flight of stairs for, and the second floor you go up another flight of stairs for. But, in fact, they go not to the apartment that the informant has described, but to somebody else's apartment. And you could rationally think of that as three or two. I mean, I think it's ambiguous. Well, again, with respect, I would disagree that there's an ambiguity. Why does the warrant then describe two different apartments? The police searched two different apartments. Right. Okay, so the warrant described one apartment, the second floor apartment. That's where the officer went. And I do want to return to some of this argument that the officers were confused when they came to conduct the search or that they went into both units at the same time. There's absolutely no evidence. Oh, yes, there is. You know, your brief says that the record contains no support for the notion that officers entered both units simultaneously. But Dodson, you know, Dodson testified to exactly that fact based on his hearing of the breach of two doors simultaneously. Why isn't his testimony based on his personal auditory experience supporting the record for that fact? Judge Roebner, his testimony was that he heard two booms. He said he didn't know where they came from. Now, we know the officers forcibly breached the second floor door, the Wade's apartment door, the second floor door, the unit they had the warrant for before he saw them. All he said was he heard two booms. He didn't. He actually acknowledged he didn't know where they came from. So the only evidence behind this idea of simultaneous breach is that he heard two booms. He said he didn't know where they came from. We know that there were booms on the second floor door. So there's there's I mean, it's just it's wild speculation that there was any confusion on the part of the officers when they came to the building. They went to the second floor building. Sorry, the second floor unit. They entered it through the front door. And then it was later, you know, the short period of time later that they entered the first floor through the back door. Now, at the time that they entered the second floor unit, it matched the description in the warrant. It was a second floor unit. It had the same sort of layout. Now, one thing to note is when the officers did go into the first floor unit through the back door because they saw someone run down there. You know, at that point, they did find in plain sight evidence of a substantial drug operation. That doesn't mean that they at that point had to know they had to believe that they had the wrong apartment in terms of a unit to. They you know, that was where Joe said he had bought the drugs. And, you know, the second floor unit actually matched the description better than the first floor unit. When Joe said, I went to this apartment and I bought drugs, he said Terrell Johnson went into a back bedroom, took a bag of cocaine, it was smaller bags in it, from a closet in the bedroom. He didn't say, I saw, you know, a substantial amount of drugs and packaging supplies out in the apartment, which was something you would expect. Why is that pertinent? I mean, he's I'm sure there are lots of things he didn't say. You know, what color was the rug? You know, it's I don't get too much from that. Well, Your Honor, you know, he was he was providing he was acting as an informant. And the most important thing he could say is I bought drugs, which is what he does say. The most pertinent thing. But it would it would seem that if he's providing information to an officer, knowing that he's providing information for a bust, you would expect that if he saw lots of drugs out in the open, but that'd be something you mentioned. That's not that doesn't show up. Now, we don't know for sure that he would. But the point is, the second floor weren't all out all over the place the other day. Maybe Johnson was in the middle of doing something with them. It's possible. But they the fact that the officers found this evidence on the first floor was not itself evidence to immediately conclude that the second floor unit was the wrong place. But it justifies there were five apartments and, you know, they went to two and there's nothing there. And they can go to three because there might be or four or five. I mean, no, they had they had a warrant for the second floor, which was the first one that they entered. So, no, absolutely not. If they go to one apartment, don't find anything. They can't go to another apartment. They entered. They didn't have a warrant for the first floor, which they entered because they followed somebody there. Nobody can challenge. There's nobody here standing to challenge entry of the first floor council. And that's the very problem that Judge Wood has been pressing you on. They might, in fact, have had a warrant for what you're calling the first floor. But what Dell called the second floor. Right. How does when there is some ambiguity in what a warrant covers, how does Illinois handle that? How does Illinois resolve that? By having the police search everywhere that's possibly within the scope of the warrant? Because then you really got a specificity problem under the Constitution. What other means does Illinois have for handling ambiguity in what a warrant authorizes? I mean, if the warrant is truly ambiguous and the officers get to the building and they realize it says single family home or we're not sure which one's the first or the second floor, then they should go back to the judge and they should get more information. They can't just go into whichever apartment they choose. But in this case, the warrant said second floor apartment. They went to the second floor apartment. It had a two on the door. The problem is, as Judge Wood pointed out, which one was the second floor apartment? That's not clear. I think it was clear to the officers. I'm not sure it was. And I'm worried that there's a disputed issue of fact here that may be very important, which is whether the officers on their own just decided to go into both apartments since they didn't know. They tried to resolve the ambiguity by an all of the above approach. Or, on the other hand, whether they didn't go into the Johnson apartment until Nero is fleeing and they're in hot pursuit. And, you know, that would be a completely different scenario, at least in my opinion. But I don't know whether this record allows us to resolve that fact issue. Well, again, the record, I mean, it's really just pure speculation. The idea that they went into both apartments at the same time, they went into the second floor apartment first. I think the only question then, why shouldn't we take the facts in the light most favorable to the Wades? I mean, summary judgment requires us to draw reasonable inferences in favor of the non-moving party. But in this case, somebody saying, I heard two booms and I don't know where they came from, doesn't show they did that. Now, that really just leaves the question whether when they found what they found on the first floor, they had a reason to conclude that they were in the wrong place. And we think it was at least reasonable for them to continue the search. They weren't required to terminate it immediately. And the minimum are entitled to qualified immunity on that issue, as we explained. Bottom line, just so I have this straight, your bottom line argument is this. Yes, they did go to the wrong apartment. But once they saw Johnson run through apartment two to apartment one, they had the right to go into apartment one. Is that your argument? No, it's not. It's that they properly went to unit two. They had a right. They had the right. They had a warrant to go to unit two. That's where they went. Now, nobody's challenging they're going into unit one because those people are plaintiffs here. We believe that when they saw somebody run into unit one, that that entry was justified by exigent circumstances. And then at that point, the question becomes when they see what is in unit one, they didn't have a warrant for. The question is, were they required to immediately terminate the search of the second floor? They did have a warrant for. We submit and explain in our brief that the answer to that is no, or at least they're entitled to qualified immunity. But they had a warrant for the second floor. That's where they went. They properly entered that apartment and then later entered the first floor unit. Thank you very much. Yes, I see my time has expired. Thank you.